



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Superseding Indictment |
| *v.* | No. 1:22-CR-00183-SCJ-RDC |
| JOHN W. OXENDINE | |

THE GRAND JURY CHARGES THAT:

## Count One
### Conspiracy to Commit Health Care Fraud

1. Beginning in or about September 2015, and continuing through in or about June 2017, in the Northern District of Georgia and elsewhere, the defendant, JOHN W. OXENDINE, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Aetna, Blue Cross Blue Shield, United Healthcare, and other health care insurance providers, which are health care benefit programs affecting commerce as defined in Title 18, United States Code, Section 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Aetna, Blue Cross Blue Shield, United Healthcare, and other health care insurance providers in connection with the delivery of and payment for health

care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Scheme to Defraud

2. In executing the health care fraud scheme, the defendant, JOHN W. OXENDINE, and others known and unknown to the Grand Jury, conspired to cause to be submitted to Aetna, Blue Cross Blue Shield, United Healthcare, and other health care insurance providers, fraudulent insurance claims for medically unnecessary Pharmacogenetic, Molecular Genetic, and Toxicology testing. In furtherance of the scheme, physicians associated with Dr. Jeffrey Gallups's ENT practice in the Northern District of Georgia and elsewhere were pressured to order medically unnecessary Pharmacogenetic, Molecular Genetic, and Toxicology testing from a testing lab in Texas (the Lab Company). As part of the health care fraud scheme, the Lab Company and defendant OXENDINE and Dr. Gallups entered into an agreement whereby Dr. Gallups would receive a kickback of 50% of the net profit for eligible specimens submitted by Dr. Gallups's practice to the Lab Company for Pharmacogenetic, Molecular Genetic, and Toxicology testing. The Lab Company paid the kickbacks to Dr. Gallups through defendant OXENDINE. Defendant OXENDINE retained a portion of the kickbacks and used a portion of the kickback money to pay certain debts of Dr. Gallups.

2

## Manner and Means

3.  Defendant OXENDINE and Dr. Gallups met with representatives of the Lab Company in Dallas, Texas.  Defendant OXENDINE, Dr. Gallups, and the Lab Company agreed that Dr. Gallups's practice would order Pharmacogenetic, Molecular Genetic, and Toxicology testing, even after the owner of the Lab Company questioned why an ENT practice would need such testing.

4.  The Lab Company agreed to pay Dr. Gallups a kickback of 50% of the net profit for eligible specimens submitted by Dr. Gallups's practice to the Lab Company for Pharmacogenetic, Molecular Genetic, and Toxicology testing. These payments were made to defendant OXENDINE, rather than directly to Dr. Gallups or Dr. Gallups's practice.

5.  On or about September 19, 2015, Dr. Gallups's practice held a meeting at the Ritz Carlton hotel in Buckhead.  At that meeting, defendant OXENDINE gave a speech where he told the doctors that they needed to order the Pharmacogenetic, Molecular Genetic, and Toxicology testing for their patients.

6.  On or about December 14, 2015, Dr. Gallups executed a business associate agreement and an Independent Contractor Agreement with the Lab Company on behalf of his medical practice.  The Independent Contractor Agreement had several exhibits, including exhibits for Pharmacogenetics & Molecular Genetics Marketing Commission Terms and Toxicology and Drug Screening Marketing Commission Terms, which stated that Dr. Gallups's medical practice would

3

receive 50% of the net profit for lab testing that was performed by the Lab Company. The Lab Company retained the other 50%.

7. On or about May 13, 2016, defendant OXENDINE signed similar agreements with the Lab Company on behalf of his insurance services business, including an Independent Contractor Agreement. That Agreement also had several exhibits, including exhibits for Pharmacogenetics & Molecular Genetics Marketing Commission Terms and Toxicology and Drug Screening Marketing Commission Terms. Those commission term exhibits changed the payment of the 50% kickback from Dr. Gallups's practice to defendant Oxendine's insurance services business.

8. In or about June 2016, the Lab Company confirmed that it was paying defendant OXENDINE's insurance services business the kickbacks instead of paying Dr. Gallups directly.

9. As a result of the agreements, Dr. Gallups's practice instituted policies requiring doctors to order laboratory tests from the Lab Company. The orders resulted in the Lab Company submitting claims for laboratory tests ordered by Dr. Gallups's practice that were not medically necessary. In submitting these claims, the Lab Company falsely represented that tests were medically necessary and failed to disclose that tests were not medically necessary. In total, the Lab Company submitted claims seeking over $2,500,000 in payment for laboratory tests ordered by Dr. Gallups's practice. The insurance companies paid over $600,000 to the Lab Company as a result of these claims.

4

10. On or about June 17, 2016, the Lab Company sent a check in the amount of $227,066.56 to defendant OXENDINE's insurance services business for testing referrals from October 2015 through May 2016.  Those payments were for referrals for testing pursuant to the policy instituted by Dr. Gallups requiring mandatory testing, and resulted in over $600,000 in payments by insurance companies for the tests, including for patients for whom there was no medical necessity.

11. After that initial check, the testing company sent checks on an approximately monthly basis to defendant OXENDINE's insurance services business through June 2017:

| Date | Check Number | Amount |
|------|--------------|--------|
| June 17, 2016 | 3438 | $227,066.56 |
| July 15, 2016 | 3497 | $8,627.01 |
| August 12, 2016 | 3563 | $5,141.97 |
| November 17, 2016 | 3748 | $4,455.84 |
| December 14, 2016 | 1038 | $6,326.32 |
| January 13, 2017 | 1085 | $4,556.65 |
| February 14, 2017 | 1154 | $5,970.06 |
| March 14, 2017 | 1191 | $824.54 |
| April 14, 2017 | 1233 | $1,161.38 |
| June 14, 2017 | 1282 | $42.30 |

12. To pay Dr. Gallups his portion of the kickbacks, defendant OXENDINE made charitable donations and paid expenses, including attorney's fees, on behalf of Dr. Gallups. Specifically, defendant OXENDINE made a charitable donation of $150,000 on behalf of Dr. Gallups in or about September 2016. Defendant OXENDINE also paid $70,759.54 to a law firm on behalf of Dr.

5

Gallups in or about December 2016. After these payments, defendant OXENDINE retained over $40,000 of the payments from the Lab Company. All in violation of Title 18, United States Code, Section 1349.

## Count Two
## Conspiracy to Commit Money Laundering

13. The Grand Jury hereby realleges and incorporates by reference the factual allegations of paragraphs 2 through 12 of this Indictment as if the same were fully set forth herein.

14. From in or about June 2016, through in or about June 2017, in the Northern District of Georgia and elsewhere, the defendant, JOHN W. OXENDINE, did knowingly combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown to the Grand Jury, to conduct and attempt to conduct financial transactions affecting interstate commerce, which involved the proceeds of a specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

6

15. It was part of the conspiracy that defendant OXENDINE would deposit checks sent to him by the Lab Company into his insurance services business. Defendant OXENDINE deposited the checks into his own account even though the checks resulted from fraudulent claims submitted by the Lab Company for laboratory tests ordered by Dr. Gallups's practice.  Defendant OXENDINE made payments on behalf of Dr. Gallups as directed by Dr. Gallups out of the proceeds defendant OXENDINE deposited into his insurance services business bank account.

All in violation of Title 18, United States Code, Section 1956(h).

### Forfeiture

16. Upon conviction of the offense alleged in Count One of this Indictment, the defendant, JOHN W. OXENDINE, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.  The property to be forfeited includes, but is not limited to, the following:

   a. MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offense alleged in Count One of this Indictment.

17. Upon conviction of the offense alleged in Count Two of this Indictment, the defendant, JOHN W. OXENDINE, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal,

7

involved in said violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

> MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offense alleged in Count Two of this Indictment.

18. If, any of the property described above, as a result of any act or omission of the defendant:

> (a) cannot be located upon the exercise of due diligence;
>
> (b) has been transferred or sold to, or deposited with, a third party;
>
> (c) has been placed beyond the jurisdiction of the Court;
>
> (d) has been substantially diminished in value; or
>
> (e) has been commingled with other property which cannot be divided without difficulty;

8

the United States intends, pursuant to Title 21, United States Code, Section
853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and
Title 28, United States Code, Section 2461(c), to seek forfeiture of any other
property of the defendant up to the value of the forfeitable property.

A _____ True _____ BILL

_____ FOREPERSON

RYAN K. BUCHANAN
*United States Attorney*

CHRISTOPHER J. HUBER
*Assistant United States Attorney*
Georgia Bar No. 545627

David A. O'Neal
*Assistant United States Attorney*
Georgia Bar No. 342071

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

9